# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| LINDSAY LEVINSON, | ECF CASE |
| Plaintiff, | No. 1:24-CV-09202-JLR |
| -against- | |
| | SECOND AMENDED COMPLAINT |
| LASSO MARKETING, INC. and IQVIA, INC., | |
| Defendants. | PLAINTIFF DEMANDS A TRIAL BY JURY |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Lindsay Levinson ("Plaintiff" or "Levinson"), by and through her attorneys, Vladeck, Raskin & Clark, P.C., complains of Lasso Marketing Inc. ("Lasso") and IQVIA, Inc. ("IQVIA") (collectively, the "Company" or "Defendants"), as follows:

### NATURE OF ACTION

1.      In early 2020, the co-founders of Lasso, Gregory Field ("Field") and Mike DiNorscio ("DiNorscio"), both white men, recruited Levinson to join the Company to lead its Customer Success team. Lasso was an early-stage start-up, and Levinson joined believing that she would be treated the same as comparable men in terms of her title, responsibilities, pay, and equity. However, soon after Levinson agreed to join the Company, Lasso hired a less experienced man, Matt Falcone ("Falcone"), as Vice President of Customer Success and her new supervisor. Despite being the Company's fifth employee and a successful and experienced Customer Success professional, Lasso's leaders repeatedly ignored Levinson's contributions to the Company, failed to consider her for promotions, and hired less experienced and qualified men to more senior positions and paid them more.

1

2.      In July 2022, IQVIA acquired Lasso. As part of the transaction, Levinson learned that the Company had significantly underpaid her as compared to Lasso's male employees, including Falcone. In addition, The Company also treated other women and people of color worse than its white male employees and leaders, including with regards to their compensation.

3.      As a result of the Company's discriminatory conduct, Levinson's health suffered significantly, preventing her from working. She has been on a medical leave of absence since September 2022.

4.      Levinson brings this action to remedy Defendants' discriminatory and retaliatory treatment. Specifically, Levison brings this action to remedy violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law § 296 et seq. (the "NYSHRL"); and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL")

<u>JURISDICTION & VENUE</u>

5.      This Court has jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

6.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims because these claims closely relate to the Title VII claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants regularly do business in New York, New York and many of the acts of discrimination and retaliation occurred within the Southern District of New York.

8.      Pursuant to Section 8-502(c) of the New York City Human Rights Law, Plaintiff will cause to be served a copy of the Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

9.      Before filing this action, the applicable administrative pre-requisites have been satisfied, including Levinson's filing a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") against Defendants alleging claims of gender discrimination and retaliation and the EEOC's issuing a notice of right to sue.

PARTIES

10.      Levinson, a woman, is a client services and account management professional who has worked for Lasso and, following its acquisition, IQVIA since March 2020. She is a resident of New York. She has been on medical leave since September 13, 2023.

11.      Lasso was a start-up company headquartered in Texas. Lasso has an office in New York City, where it employs Levinson.

12.      IQVIA acquired Lasso in or around July 2022. IQVIA is headquartered in North Carolina. IQVIA continues to operate Lasso.

13.       Following IQVIA's acquisition of Lasso, Lasso employees who worked in its New York City office, including Levinson, began to report to IQVIA's existing New York City office.

FACTUAL ALLEGATIONS

Plaintiff's Background

14.      Levinson is an ivy-league graduate. Levinson holds a Bachelor of Arts degree from Princeton University and a Master of Business Administration ("MBA") degree from Columbia University.

15.     Levinson has over a decade of experience in client services and account management at technology companies, and specifically at advertising technology ("Ad Tech") companies. At technology companies and startups, client services roles are often called "customer success."

16.     Levinson worked at Indeed from 2011 to 2013 in Senior Consultant roles, and AppNexus (later renamed Xandr) from 2013 to 2019. At these companies, she built new teams; led cross-functional projects; established and wrote instructions and guidance related to internal processes; and trained and mentored new hires.

17.     In particular, at AppNexus, Levinson received multiple promotions. In 2013, she began working as a Business Support Specialist, Global Services. AppNexus awarded Levinson its 2016 "Values in Action" award, which included a grant of significant equity compensation. In 2016, the Company promoted Levinson to Senior Partner Manager, Marketplace Partners and she managed clients responsible for multiple millions in annual revenue. In 2019, AppNexus promoted her a second time. As Partner Director, Marketplace Partners, Levinson managed a group of clients that generated several millions in dollars in annual revenue. In these roles, Levinson built teams, set up processes, trained and mentored employees, and assisted with hiring.

<u>Lasso Recruits Levinson to Join the Company</u>

18.     Field and DiNorscio founded Lasso in 2019 as a self-funded or "bootstrap" start-up company. Field and DiNorscio are both white men. DiNorscio lived in New York City until mid-to-late 2022.

19.     Throughout Levinson's employment, the executive leadership team at Lasso was comprised of nearly all white men.

20.     The co-founders of Lasso, Field and DiNorscio, had previously worked at Xandr. As a result, many Lasso employees were hired directly from Xandr, based largely on their credentials and experience working at Xandr.

21.     In or around early 2020, Field and DiNorscio approached Levinson to join Lasso. She had worked with both Field and DiNorscio at AppNexus and understood that they were recruiting her because of her client services experience, professionalism, knowledge of advertising technology, and experience building and running successful teams. Levinson told Field and DiNorscio that she was not looking to join another start-up company and was focused on finishing her MBA program at Columbia University. She was due to graduate from that program in May 2020.

22.     To encourage Levinson to join Lasso, Field and DiNorscio told her that she would be a leader at Lasso, including having a direct hand in building the culture. They told Levinson that in her role, she would be leading client services. When Levinson joined Lasso, Field stated that she would be "responsible for managing all new client relationships," among other responsibilities. Levinson also understood that she would be reporting directly to DiNorscio, who was Lasso's Chief Revenue Officer, and part of the leadership team as the Company grew.

23.     Lasso offered Levinson a salary and bonus that were not commensurate with her experience or qualifications. Although Levinson successfully negotiated some additional compensation, the Company still refused to properly recognize her experience and qualifications.

24.     First, the Company initially would not agree to assign Levinson the appropriate title. She requested a title of Engagement Director, given her previous titles at AppNexus. Lasso initially rejected her request, only later agreeing to offer her the title of Engagement Director.

25.    Second, Levinson sought a higher base salary and bonus because the amount ultimately offered resulted in less total compensation than she had received at AppNexus. Lasso's co-founders also rejected her efforts to negotiate more compensation. DiNorscio told Levinson that everyone at Lasso was making less money than they had previously in order to create a profitable "bootstrap" business and avoid venture capital funding. However, upon information and belief, Lasso paid its male employees higher salaries and awarded them more equity.

26.    While Levinson believed that the Company would treat her the same way it treated similarly situated men, this turned out not to be the case.

<u>Levinson's Successful Career at Lasso</u>

27.    Levinson began working at Lasso on March 16, 2020 as an Engagement Director, and was one of the Company's first full-time employees. Her offer letter stated that she was a "full-time, remote" employee "based out of New York, New York[.]"

28.    At all times during Levinson's Lasso employment, she lived and worked in New York. Moreover, virtually all of the misconduct described below took place in New York, New York.

29.    At the time Levinson joined Lasso, she was the Company's fifth employee and the first woman to join the Company as a full-time employee. When Levinson joined, Lasso's sole employees were the founders, Field and DiNorscio; Lasso's CTO; and the lead engineer. Lasso also worked with multiple contractors, only one of whom was a woman.

30.    When Levinson started, she managed Lasso's relationship with its first major client, Haymarket Media Group ("Haymarket"). As the Company added other clients, she managed those clients as well. Clients expressed their praise for Levinson and her work. For example, Haymarket told Field that "[Levinson] is a saint."

31.     Levinson created Lasso's client onboarding process and helped document and improve upon the Company's standard process for responding to requests for proposals ("RFPs"). During her tenure, Levinson was also responsible for creating and maintaining Lasso's subject matter expert program; client-facing materials; some business processes and trainings related to them; some other training materials; and Lasso's customer success wiki. Levinson grew client and partner satisfaction for clients and partners assigned to her and established a vibrant company culture. Levinson also coached a long-tenured employee who was struggling and helped that employee improve her performance to the point that she received a promotion; she referred to Levinson as "one of the best managers" she had ever had. In the third quarter of 2022, Levinson won a Lasso "Spotlight Award" based on votes from Lasso employees.

### Lasso Repeatedly Assigns Men to More Senior Roles Than Levinson

32.     Throughout Levinson's employment, the Company hired men at more senior titles, promoted them, assigned them more responsibilities, and/or awarded them greater compensation without regard to their experience or skills.

33.     In contrast, the Company forced Levinson to repeatedly advocate for additional pay and a better title. Despite Levinson's excellent performance and better qualifications than some of her male counterparts, the Company rejected many of her requests, including failing to recognize her work by elevating her to the senior leadership team.

### Lasso Hires a Less Qualified Man to Be Levinson's Supervisor

34.     Though Lasso's co-founders had told Levinson she would be leading client services (sometimes called customer success), in the spring 2020, Lasso hired Falcone as Vice President of Customer Success.

35.     In or around May 2020, after Falcone had already signed his offer letter, one of the co-founders abruptly told Levinson that she would be reporting to Falcone. Falcone is a white man.

36.     Falcone's hiring was contrary to what the Company had told Levinson about her position at Lasso. For example, during the hiring process, the co-founders had led Levinson to believe that she would be leading Customer Success, but gave that role to Falcone. Lasso's leadership did not advertise the Vice President of Customer Success Position as being open. Levinson was not involved in the interview process. Nor did senior management warn Levinson that Lasso would be hiring someone above her in the near future when she joined. If Levinson had known that she would not be leading the client services (customer success) team, she would not have joined the Company.

37.     The Company appointed Falcone to supervise Levinson even though he was a less experienced customer success professional than her. For example, he had two years less experience than Levinson in Ad Tech.

38.     Also, Falcone joined Lasso from AppNexus (now called Xandr). At AppNexus, Falcone worked as a Manager and Senior Associate Director. These roles were less senior than Levinson's roles at AppNexus; when Levinson left AppNexus, she held the title of Partner Director.

39.     Falcone was less qualified than Levinson in other ways. For example, Falcone only held a Bachelor of Science Degree, and no post-graduate degree. In contrast, Levinson has an advanced degree, an MBA, which was directly relevant to the work she was doing at the Company.

40.     Upon information and belief, Lasso paid Falcone a higher base salary and offered him more equity when he joined Lasso than the Company offered Levinson, though Falcone was less qualified and less experienced.

41.    After Falcone's hiring, the Company excluded Levinson from meetings with large clients. The Company invited Falcone to attend those meetings.

42.    In or around 2021, the Company promoted Falcone to Senior Vice President of Customer Success. The Company did not promote Levinson to Vice President or above during her employment despite her hard work and important contributions.

### Lasso Fails to Take Levinson Seriously for the Chief of Staff Role

43.    In late 2020, Lasso created an open Chief of Staff position reporting to Field, the CEO. Levinson applied for this position as a way to join the senior leadership team of Lasso.

44.    Levinson expressed her interest in the position to DiNorscio, who delayed moving forward with her application.

45.    In early 2021, Levinson applied more formally for the Chief of Staff position and interviewed for the position. Levinson prepared a slide deck explaining her plans for the position. Field did not attend Levinson's interview and DiNorscio forbid her from speaking to Field about the role. DiNorscio then told Levinson she was not selected for the role, which was never filled.

46.    Later, Field told Levinson that he had not been aware that she applied for the job.

### Lasso Hires a Less Qualified Man and Assigns Him More Responsibilities Than Levinson

47.    In late January 2021, Lasso hired a man as Director of Technical Account Management (the "DTAM").

48.    As had occurred with Falcone's hiring, the Company did not tell Levinson that there was an open position, nor did Lasso include her in the hiring process.

49.    The DTAM was given responsibilities that Levinson had previously held and clients she had previously managed. These responsibilities included managing Customer Success onboarding and training and managing strategic clients.

50.     The DTAM also had lesser qualifications than Levinson. For example, he had no advanced degree. As set forth above, Levinson did.

51.     Despite his lesser qualifications, senior management immediately assigned the DTAM a group to oversee, which included two direct reports and at least four new hires in the subsequent months. The DTAM then used training materials Levinson had created to train employees he supervised.

52.     At that time, the Company had not formally assigned employees directly to report to Levinson even though she had trained employees and effectively was leading them.

53.     When Levinson raised concerns to Falcone and DiNorscio that Lasso had given the DTAM direct reports, Falcone told her that the DTAM had prior management experience. However, to the best of Levinson's knowledge, the DTAM did not have many formal direct reports at Xandr, nor did he hold the title and responsibilities of manager for long.

The Company Forces Levinson to Repeatedly Ask for a Promotion and Better Compensation

54.     In contrast to Lasso's treatment of male employees, Levinson had to advocate for equitable treatment.

55.     After Choudhry's hiring, Levinson began requesting a title change and increased compensation. In May 2021, after extensive lobbying, Lasso changed Levinson's title from Engagement Director to Director of Account Management and awarded her additional equity. It was unclear if this was a promotion or merely an alignment of titles and fulfillment of promises made to Levinson when she joined Lasso.

56.     In fall 2021, Lasso purportedly assigned Levinson a direct report. In a company-wide virtual meeting (called an "all hands" meeting), Falcone diminished Levinson's

responsibilities. Falcone told the attendees that Levinson's direct report would only be "kind of" reporting to Levinson.

<u>Lasso Further Discriminates Against Levinson</u>

57. Despite Levinson's experience and expertise, Lasso's co-founders consistently treated her worse than they treated male employees.

58. For example, when Levinson first started at Lasso, for several months, Field and DiNorscio insisted that she set up her email account to forward all her emails to them and later Falcone. DiNorscio asserted that he wanted to ensure she did not miss anything. Upon information and belief, Lasso executives did not require that any men automate their email account to forward all emails to the co-founders.

59. DiNorscio subjected Levinson and other women to different standards than male employees, including using a harsher tone when providing feedback to woman as compared to men. For example, as set forth above, DiNorscio closely monitored Levinson's email messages. If Levinson did not respond quickly enough and "perfectly" to an email, according to DiNorscio, he would criticize her. On one occasion, DiNorscio reprimanded Levinson for not replying to an email in fewer than four hours on a day she was particularly busy. Upon information and belief, DiNorscio did not chastise men for failing to write perfect emails or to do so within a certain amount of time.

60. In addition, senior management required Levinson to run drafts of emails sent to clients by DiNorscio and Falcone until sometime in mid-2020. As an experienced Customer Success professional, Levinson found this demeaning and undermining. Upon information and belief, DiNorscio and Falcone did not ask similarly situated men to show a supervisor drafts of client emails during Levinson's tenure.

61.     When Levinson requested additional support for her large volume of work in late 2020, Falcone directed her to provide detailed time-tracking so he could determine where she was spending her time. To Levinson's knowledge, when male employees complained about being overburdened, senior management did not ask them to justify needing help before providing them with additional resources.

62.     Despite Levinson's experience, she was frequently not invited to meetings with clients that the Company had supposedly assigned to her. For example, Levinson was asked to set up multiple meetings between DiNorscio, Field, and the client representative at Haymarket. Haymarket was a client Levinson worked with closely. However, senior management often told Levinson explicitly not to attend such meetings.

63.     In contrast, on information and belief, Lasso did not direct male employees to arrange meetings and then prohibit them from attending them. In particular, the Company permitted Falcone the opportunity to join meetings with his assigned clients. Similarly, when the DTAM joined Lasso, the Company gave him a client that Levinson was managing at the time. Immediately after he started working for Lasso, the Company paid for the DTAM's airplane travel to meet with that client several times. Also, the Lasso founders gave the DTAM the support and resources to grow the account.

64.     Lasso's co-founders and Falcone often treated Levinson like a secretary. They asked Levinson to perform tasks such as following up with clients to pay their outstanding invoices, to post Lasso's engineering job openings, and to set up meetings at conferences she was not invited to attend. Upon information and belief, Lasso's co-founders did not ask men in comparable positions to perform secretarial tasks in addition to their job duties.

65.     Unlike men in similar positions, Levinson was not invited to meetings at Lasso's office in Austin, Texas, where Field was based, until a Company-wide party in April 2022.

66.     In addition to the disparate treatment described above, Field and other senior managers made comments demonstrating gender bias. For example, sometime in early 2020, during a video meeting, Field joked that Levinson needed to grow a beard. Levinson was the only woman on the call and the only person without a beard.

67.     Also, Levinson did not receive comparable benefits or compensation as male employees at Lasso. In July 2020, Lasso opened a "Sales & Customer Success Headquarters" in Brooklyn and required its four New York-based employees to come into the office daily. Levinson observed that Falcone and DiNorscio sometimes took cabs to and from work because of their concerns about the COVID-19 pandemic. Upon information and belief, the Company permitted Falcone and DiNorscio to expense those cabs. However, the Company did not offer Levinson this option and, instead, she took the subway. Nor did Falcone, who lived nearby to Levinson, suggest that they commute together or offer to share a cab with her.

68.     Senior management regularly recognized the efforts of the men. In contrast, the Company often failed to acknowledge Levinson's work and the efforts of other women employees. For example, during 2020, Falcone and Levinson hired a Technical Account Manager (the "TAM"). Levinson trained the TAM, and he later stated that, "[t]he fact that [he] was even moderately useful in the beginning was because of [Levinson]." In January 2021, Falcone and Levinson hired an employee whom Levinson also trained and helped manage. However, the Company credited Falcone for Levinson's work training and supervising that employee and the TAM.

69.     DiNorscio also publicly praised men for closing major deals, when in fact, a woman had been behind the deal. For example, in July 2022, DiNorscio complimented the TAM, a white man, for work that a woman of color had done.

<u>Lasso Discriminates Against Other Female Employees</u>

70.     The Company's discriminatory treatment against Levinson was not an isolated incident. Levinson observed, and several female employees complained to her about, discrimination against other women.

71.     For example, in early 2021, Lasso hired a Director of Operations. In or around March 2022, the Company promoted the Director of Operations to Vice President of Operations (the "VPO"). The VPO was the only female employee to be considered a member of the leadership team.

72.     Upon information and belief, the Company did not assign the VPO the same compensation or authority as men on the leadership team.

73.     On one occasion prior to her promotion to Vice President, the VPO told Levinson that she had been the lowest paid Director at Lasso. In documents related to IQVIA's acquisition of Lasso, the VPO was not listed on the table of employees who received a "Parachute Payment."

74.     In addition, Levinson observed Lasso's senior leadership undermine the VPO and give her the same type of secretarial duties Levinson had received early in her employment, such as taking notes in meetings; scheduling travel for other employees; providing snacks for the New York office; and cleaning the New York office.

75.     In addition, Lasso leadership excluded its female employees from social gatherings and meetings. For example, in March 2021, the VPO and Levinson joined a video conference meeting and learned that there was an office gathering that day they had not been invited to attend.

That day, six men had gathered in the office, including Vice President, Product, McLean Shaw ("Shaw"); Falcone; and Field. On other occasions, Lasso's executives and male employees organized in-person office days that included expensive lunches at restaurants like Peter Luger's without inviting any female employees.

<u>Levinson Made Protected Complaints in 2021</u>

76.     Throughout 2021, Levinson repeatedly raised concerns about gender bias, including concerns about the Company's pay and promotion practices. Levinson spoke about those issues with, among others, Falcone and DiNorscio.

77.     Because neither Falcone nor DiNorscio took steps to address the problems, Levinson believed she had no choice but to raise her concerns to CEO Field in late 2021.

78.     In October 2021, Levinson had a meeting with Field about her ongoing concerns about the discriminatory culture at Lasso.

79.     In December 2021, Levinson had a follow up meeting with Field. During the meeting, Levinson raised the issue of DiNorscio's feedback. Levinson told Field that the primary negative feedback she had received from Falcone and DiNorscio was that she was purportedly "not strategic." This feedback, which was untrue and not actionable, was used to justify Levinson's exclusion from the leadership team and from consideration for multiple promotions. Upon information and belief, DiNorscio did not use vague feedback as the basis for important decisions concerning the employment of male employees.

80.     After the meeting, Levinson sent Field an article called, "Why so many women in tech get told they're 'not strategic'" from the online publication <u>Fast Company</u>, published in September 2020. The article discussed a sex discrimination lawsuit that the former Pinterest COO

brought against her company, and the use of the phrase "not strategic" to justify passing over women for promotions.

<u>Lasso's False Promises</u>

81.    After numerous conversations with Field and others about gender bias and Levinson's treatment at Lasso, Field told Levinson he would be assigning her four teams to lead, including two that had not yet been built. These four teams were account management, planning, social activation, and product support. While the Company assigned Levinson those teams after her bias complaints, the Company never gave Levinson a budget to work with in her supposed capacity as a team leader. Lasso gave its male employees, including Falcone, budgets to manage.

82.    In early 2022, Lasso finally gave Levinson some of the additional responsibilities that senior management, specifically Field and Falcone, had stated she would get. However, the Company did not provide Levinson adequate resources to successfully perform her job. For example, the Company did not let Levinson hire sufficient employees to manage the team's responsibilities and the increasing workload effectively. After the Company allowed Levinson to hire two additional employees in early 2022, senior management blocked her from hiring all of the staff it had promised her.

83.    Instead, Lasso diverted resources and staff that the Company had promised Levinson to teams that a new Senior Director of Technical Account Management, Client Services (the "Senior Director"), a man, led. The Senior Director's teams were overstaffed such that employees who reported to him did not have sufficient work, while the teams Levinson managed were overworked and understaffed. Eventually, the Senior Director and Levinson agreed that she would be allowed to unofficially assign her teams' projects to his direct reports.

### The Company Fails to Appoint Levinson to the Senior Leadership Team

84.     Throughout 2022, Levinson raised concerns about her title and pay, including in conversations with Field, DiNorscio, and Falcone.

85.     When Levinson sought feedback from DiNorscio and inquired into why she was not considered a member of the leadership team, rather than criticizing her performance, as set forth above, DiNorscio gave Levinson vague and non-actionable feedback. In early 2021, DiNorscio told Levinson that she was "not contagiously enthusiastic enough in group meetings." In addition, DiNorscio also repeatedly told Levinson that she was "not strategic" and needed to be "more positive." On information and belief, DiNorscio did not make these types of comments to men in comparable roles.

86.     During meetings with Field in July 2022 beginning on July 20, 2022, Levinson renewed her request to be placed on the Senior Leadership Team. She provided support for her request, including documentation demonstrating her important contributions to Lasso and its growth.

87.     Field rejected Levinson's request to be promoted to the Senior Leadership Team despite her better qualifications than many of the male members, including her educational background, experience in the industry, tenure working for the Company, and her success there.

### The IQVIA Acquisition Confirms That the Company Compensates Levinson Less Than the Men

88.     In July 2022, at the time IQVIA acquired Lasso, as a Lasso stockholder Levinson received certain required disclosures about the compensation paid to some of the executives. The paperwork included a capitalization table ("Cap Table"), which identified the highest compensated Lasso employees in connection with the transaction. The disclosures revealed that those executives

were all men and, with one exception, white. A coworker commented, in sum and substance, "Other than Eric [Shih], it was white men who got rich."

89.     From these disclosures, Levinson learned that the Company paid male and mostly white employees significantly more than her.

90.     The Company paid male and mostly white executives more than Levinson even though in many instances she had similar (if not better) qualifications, industry experience, tenure at the Company, and/or success during her tenure.

91.     As of July 2022, Levinson's annual salary was significantly less than male employees. For example, Falcone's, Shaw's, and Chief Growth Officer Eric Shih's ("Shih") salaries were, respectively, 1.7, 1.5, and 1.6 times higher than Levinson's salary.

92.     Also, as part of the deal, the Cap Table revealed that the Company awarded Levinson a significantly lesser package than the male employees. For example, Falcone's, Shaw's, and Shih's total packages, which each included a retention bonus that would vest several years from the transaction, were worth, respectively, over five, four, and three times as much as Levinson's total package, which also included a retention bonus that would vest several years from the transaction.

93.     Of Falcone, Shaw, and Shih, Levinson had more experience, better qualifications, and/or a longer tenure at the Company than they did. For example, Levinson joined the Company in March 2020, has an advanced degree relevant to her work at Lasso, has been working since 2010, and has been working in the AdTech industry since 2013; as described above, Falcone, joined the Company in April 2020, has no advanced degree, has been working since approximately 2011, and has been working in the AdTech industry since 2015; Shaw joined the Company in February 2021, has no advanced degree, has been working since approximately 2013, and has been

working the AdTech industry since 2016; and Shih joined the Company in January 2022, has an advanced degree in Music Business, has been working since 1999, and has been working in AdTech on and off since 2000.

94.    None of the differences in experience, qualifications, tenure, and success warranted paying the male employees more than three times what the Company awarded Levinson in connection with the deal.

95.    The VPO, the only woman on the leadership team, was also the only Vice President at Lasso without sufficient equity to be included on the Cap Table.

<u>After the Acquisition, Levinson Makes Additional Protected Complaints</u>

96.    After the acquisition, IQVIA offered Levinson the position of Associate Director.

97.    Following the IQVIA acquisition, the gender discrimination continued. On information and belief, Levinson continued to have a lesser title and lower pay than her male Lasso counterparts. Her attempts to get a raise and higher title were met with firm pushback by Field, Falcone, and the new Company owners.

98.    In August 2022, Levinson continued asking Field about joining the leadership team and requested a promotion to Vice President of Customer Success. She also made additional gender discrimination complaints. For example, during a conversation with Field in or around August 2022, Levinson specifically stated that it was "very hard to be a woman" at Lasso; that she was "grossly undercompensated" as compared to male employees; and that she experienced bias throughout her tenure. Levinson asked that the Company no longer undervalue her and compensate her appropriately.

99.     In September 2022, Levinson had a conversation with Falcone where he rejected the idea of her promotion. Levinson asked him, "Do you honestly think I've contributed to Lasso just 20% of what you have?" Falcone said nothing in response.

100.    In or around September 2022, Levinson also had at least one discussion with Frank Lin ("Lin"), who was Vice President and General Manager of Digital Media at IQVIA, about her pay and her title. Lin made clear that no changes would be made to either Levinson's level or compensation.

<u>Levinson's Medical Leave & Subsequent Retaliation</u>

101.    As a result of the Company's discriminatory conduct, Levinson's health suffered significantly. Due to her suffering health, Levinson began a medical leave of absence on September 13, 2022.

102.    Levinson was medically cleared to return to work in March 2025. On March 20, 2025, IQVIA offered Levinson two positions, a Project Manager role or an Account Manager III role, which IQVIA claimed "would lend themselves to [Levinson's] skillset." Contrary to IQVIA's statement, these roles were blatant demotions incommensurate with Levinson's skillset and educational background.

103.    As described above, Levinson holds two degrees from Ivy League universities (a Bachelor's from Princeton and an MBA from Columbia) and has over a decade of experience in client services and account management at technology companies, and specifically at Ad Tech companies. Before Levinson's medical leave, IQVIA offered her a position as Associate Director. At Lasso, before the acquisition, Levinson was a Director of Account Management and managed multiple individuals and business units.

104.    Neither the Project Manager nor the Account Manager role required or even suggested a preference for an advanced degree. Moreover, both roles—despite their "manager" titles—were independent contributor roles, where Levinson would not manage any individuals or business units.

105.    The Project Manager role was not relevant to Levinson's skillset, so to continue her employment, she was essentially forced to take the Account Manager role. Levinson wrote to IQVIA on March 26, 2025, saying in relevant part:

> Thanks for your patience as I reviewed both Job Descriptions. While I understand that you're not adjusting my pay or grade, I'm concerned that neither position is comparable to my previous experience & responsibilities at Lasso, where I managed 4-6 direct reports (including open headcount) and was responsible for the operations & revenue associated with 3 distinct business units (namely: Self-service Account Management, Media Planning, and Social Data Activation).
>
> If there is truly nothing more suitable available, I'd prefer the Account Manager III position, which at least seems to have a small amount of overlap with work that I did previously.

106.    Levinson began in the Account Manager role on April 7, 2025. In that role, Levinson, whom IQVIA previously offered an Associate Director position, reports to an Associate Director. Levinson's salary in the Account Manager role continues to be lower than what Levinson should be earning based on her experience and qualifications.

107.    Although not immediately apparent to Levinson given that workload often increases with time spent in a new job, IQVIA has assigned Levinson minimal work since April 7.

<u>FIRST CAUSE OF ACTION</u>
Gender Discrimination in Violation of Title VII

108.    Plaintiff repeats and realleges paragraphs 1 through 107 of this Amended Complaint as if set forth fully herein.

109.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of Title VII.

110.    Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

111.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

<u>SECOND CAUSE OF ACTION</u>
Gender Discrimination in Violation of the NYSHRL

112.    Plaintiff repeats and realleges paragraphs 1 through 111 as if set forth fully herein.

113.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of the NYSHRL.

114.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

115.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>THIRD CAUSE OF ACTION</u>
Gender Discrimination in Violation of the NYCHRL

116.    Plaintiff repeats and realleges paragraphs 1 through 115 as if set forth fully herein.

117.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of the NYCHRL.

118.    Defendants engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard for Plaintiff's rights or conduct so reckless that it amounts to such disregard.

119.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>FOURTH CAUSE OF ACTION</u>
Retaliation in Violation of Title VII

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as if set forth fully herein.

121.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of Title VII.

122.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

123.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>FIFTH CAUSE OF ACTION</u>
Retaliation in Violation of the NYSHRL

124.    Plaintiff repeats and realleges paragraphs 1 through 123 as if set forth fully herein.

125.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of the NYSHRL.

126.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

127.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

SIXTH CAUSE OF ACTION
Retaliation in Violation of the NYCHRL

128.    Plaintiff repeats and realleges paragraphs 1 through 127 as if set forth fully herein.

129.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of the NYCHRL.

130.    Defendants engaged in retaliation with willful or wanton negligence, with recklessness, and/or conscious disregard for Plaintiff's rights or conduct so reckless that it amounts to such disregard.

131.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

(a)    declaring the acts and practices complained of herein to be violations of Title VII, the NYSHRL, and the NYCHRL;

(b)    directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated;

(c)    awarding Plaintiff all earnings and other benefits she would have received but for Defendants' unlawful conduct, including but not limited to wages, including back pay and front pay, bonuses, pension, and other lost benefits;

(d)      awarding Plaintiff compensatory damages, including damages for emotional

distress, humiliation, injury to professional standing and reputation, and pain and suffering;

(e)      awarding Plaintiff additional amounts as punitive damages;

(f)      awarding Plaintiff such interest as is allowed by law, and damages for any adverse

tax consequences stemming from an award;

(g)      awarding Plaintiff reasonable attorneys' fees and costs of this action; and

(h)      awarding such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all

issues so triable.

Dated: New York, New York
        July 17, 2025

VLADECK, RASKIN & CLARK, P.C.


By:      _____*/s/ Jeremiah Iadevaia*_____
        Jeremiah Iadevaia
        Demitrios E. Kalomiris
        *Attorneys for Plaintiff*
        111 Broadway, Suite 1505
        New York, New York 10006
        (212) 403-7300